Motion to Remand.
Plaintiff filed on the day of hearing in this Court a motion to remand the case to the District Court for the purpose of adducing testimony as to plaintiff's present condition and continued disability since the date of the trial in the District Court. This motion sets forth that since the case was tried in February, 1947, there has been no improvement in plaintiff's condition; that he has been continuously and totally disabled to do any work because of his inability to use his left leg except by dragging it and using a support. He further alleged that his disability has been continuous and constant from the time he was injured, April 5, 1946.
Attached to this motion to remand are the affidavits of plaintiff himself, a doctor and five lay witnesses.
The allegations and affidavits allege no new development in plaintiff's condition, but simply re-state the case as outlined in his petition and offer what amounts to additional statements that plaintiff was able to work prior to the alleged injury and has been disabled since, all of which was gone into at length on the original trial.
[1, 2] Appellate courts have the right and duty to remand cases for additional testimony. However, the occasions on which this is done are normally ones where there is newly discovered evidence or there have been unusual and unexpected developments. Where a case has been thoroughly tried and lengthy evidence adduced from numerous witnesses as was done in the case before us, it would not be proper for the case to be remanded for the taking of testimony which would be, essentially, cumulative to that adduced by plaintiff on the trial of the case.
The motion to remand is overruled.
 On the Merits.
This case is before us on appeal from a judgment rejecting plaintiff's demand for compensation for permanent and total disability not to exceed four hundred weeks. The claim is based on an alleged back injury to plaintiff as he was assisting in carrying a heavy object down a narrow steel stairway in defendant's Ouachita Parish paper mill.
The answer admitted the employment of plaintiff; denied the occurrence of the accident as alleged; admitted payment of compensation over an eight week period and set forth that further payments were discontinued for the reason that the reports of attending physicians certified a termination of the temporary disability suffered by plaintiff.
The learned District Judge gave written reasons for judgment which we quote below:
"Claiming total and permanent injuries to his back and legs received while working at the Brown Paper Mill Company, Inc. on April 5, 1946, plaintiff prays for maximum benefits provided by the Workmen's Compensation Act.
"Plaintiff, a colored man 30 years of age, at the time of the alleged injury was engaged with a fellow worker, Joe Johnson, in carrying down a narrow stairway a heavy piece of machinery, a bearing for installation on one of the bark drums at its paper mill in West Monroe. For better handling a 1 1/4" pipe about 5' long was passed through the bearing which was lifted when the workmen raised upward on both ends of the pipe. The pipe was too long to go between the guard rails on the stairs and this required the two men to carry the bearing at an angle to the steps while taking it down the stairs. It was while so proceeding with Joe Johnson holding the front end and Jessie Johnson the rear end that Jessie says the accident occurred. He attributes the injury to a stumble due to the bearing slipping or shifting on the pipe thus causing undue weight upon his end and the resulting disability to his back.
"He declares he reported the back injury to his fellow employees shortly after reaching the downstairs and later he informed Mr. Jackson, his foreman, that he had hurt his back. He then continued to *Page 776 
work the remainder of his shift. The following day he came to work but after a half hour he complained again to Mr. Jackson and was sent to the first aid room and was given heat treatments. He went back to work for a short while and complained again, this time he was sent to see Dr. J.Q. Graves under whose care he remained until May 28. He was treated for a back sprain and on May 7 was sent to the St. Francis Sanitarium as he complained his back had not improved. At his own request he was released from the hospital to go back to work on May 28.
"Some twenty-one lay and medical witnesses were called by both sides. There were marked differences of opinion among the expert witnesses. Two of plaintiff's doctors based their opinion of a fractured vertabra upon certain x-ray pictures. Others, including Dr. Armstrong who was called to the stand on behalf of plaintiff, could find no evidence of any disability to the bony structure. While it would be possible to receive a fractured vertabra from an awkward step, it is certainly a rare occurrence and it seems unlikely plaintiff received any bone injury. In the absence of trauma to the bony structure any strain suffered by the muscles of a young able bodied man of 30 would have disappeared after the lapse of time prior to trial. Furthermore, plaintiff stated to Drs. Moseley and Hamilton he felt no pain until 10 and 6 minutes respectively after he stumbled on the stairway. Medical jurisprudence tells us that such an injury to the muscles would have caused immediate pain and would not have permitted the continued work by plaintiff before he placed himself under the care of a doctor.
"For the foregoing reasons the demands of the plaintiff are rejected."
The record discloses that plaintiff at the time of the injury was thirty years of age; still living with his mother; that he had been engaged in manual labor for various employers in the vicinity of Monroe all of his Adult life and that the present suit is his first claim for compensation.
Plaintiff's statement of the injury was that he and three others were carrying a heavy boxing from a room upstairs. To facilitate carrying the boxing, a pipe was run through it; that a fellow workman, Joe Johnson, was in front and he was in the rear; that he stumbled and that made the front man stumble and caused the boxing to slide along the pipe; that when "I stumbled he raised up on his end and that throwed the boxing to slide down on me. That's where the strain come on my back."
Plaintiff fellow employees testified that plaintiff, with three other employees, was carrying a heavy metal boxing weighing two or three hundred pounds; that four workmen started to bring it downstairs; that when they reached the top of the steel stairway it was found that the stairway was only wide enough to, accommodate one workman at each end of the load and plaintiff and another designated by the foreman started to carry the piece down the narrow steps; that in the process, there was some scuffling on the staircase which on cross-examination plaintiff described as kind of "stumbling like, zigzagging like on the stairway," and that when the operation was over, plaintiff complained that he had hurt his back when he was bringing the piece down.
Mr. George Stinnett, millwright for the defendant company, testified that on the day in question, it was necessary to change a bearing at the mill and that "they gave me four men to go get the bearing." He testified that the men placed a 1 1/4" pipe 5' long through the bearing for the purpose of carrying it down the steps; that on account of the narrowness of the stairway, they turned the load "cater-cornered;" that only one workman could hold to the pipe at each end. He estimated the weight of the bearing at 150 or 200 pounds, but added, "it might have weighed more." He did not notice any particular difficulty in getting the bearing down the steps, and Jessie Johnson made no complaint to him of any injury; however, he testified that he went directly to the motor house for the purpose of taking the old bearing out and putting the new one in, and that "couldn't but one or two or three men get in at the time and I don't know whether Jessie Johnson is one of them or not." *Page 777 
It thus appears that plaintiff's relationship with Stinnett on that day was brief, plaintiff being one of the four men which they "gave" to millwright Stinnett for the purpose of bringing down the heavy bearing, and as far as Stinnett remembers, plaintiff reported back to whatever assignment he had at the time he was called away as one of the four man carrying party.
The record shows that plaintiff did complain to a Mr. Jackson, who appears to have had supervision over him at the mill. The defendant did not introduce Mr. Jackson at the trial and it is logical to presume that he would have confirmed plaintiff's testimony that he made a complaint of injury following the carrying of the heavy load down the narrow stairway.
Alexander Dofford, one of the workmen detailed to Mr. Stinnett for use in carrying the machinery, testified that the bearing weighed two to three hundred pounds. He corroborated plaintiff's testimony that only two workmen could be used to carry the heavy object down the narrow stairway. He testified that when it reached the foot of the stair, it was placed on a truck and rolled on out. He testified that plaintiff and the other man "scuffled" as they went down the stairway with the load, and that plaintiff told him he had hurt his back coming down the stairway.
He confirmed plaintiff's testimony that Mr. Jackson was the foreman in charge. This witness was not a close associate of plaintiff and had only seen him once or twice since the accident happened, but testified that he was "crippled every since he got hurt * * * walking with a stick both times I have seen him." A close reading of his testimony indicates that he listened carefully to the questions asked him and gave truthful and enlightening testimony. He testified that plaintiff at the foot of the stair said he had hurt his back when he was bringing the load down and that he said this as they were loading the heavy piece on the truck at the foot of the stair.
Henry Wilson was another one of the three colored workmen who was assigned with plaintiff to the job of bringing the heavy piece of machinery down the stairway. He testified that plaintiff and Joe Johnson carried it down the steps and that he saw them begin to stumble and "near about fall, but they didn't fall and kept on down to the floor." He estimated the weight to be between "two and three hundred. It may weigh more." He also testified that when the two had succeeded in getting the machinery down to the floor, he and Alex Dofford went on down to the floor "to help them load it on the buggy carrier" and that at that time, plaintiff said "he had hurt his back taking it down."
He testified that the four workmen brought the piece of machinery to the stairway, which was too narrow for the four to take it down, and that at the foot of the stairs the four of them were again used to place the machinery on the buggy carrier.
The testimony showed that Joe Gilliam, the fourth workman on the carrying party, was "in the Army somewhere" and he was not called.
Plaintiff's petition alleges that the injury occurred "on or about May 5, 1946." In the answer defendant admits the payment of compensation from April 5 through May 30, 1946. Various treatment, examinations and x-ray pictures were made after April 5 and before May 5 and we conclude that the stairway incident relied upon by plaintiff as to the cause of his injury occurred on April 5, 1946.
We have deemed it proper to make a complete and detailed study of the testimony regarding the circumstances surrounding the alleged injury because, after a careful study of all the medical testimony, we find that the doctors are not at all in agreement on the extent of plaintiff's disability.
When plaintiff was injured, he was carried for treatment to Dr. J.Q. Graves, who later placed him in the St. Francis Sanitaruim. He was kept in the sanitarium for three weeks, after which time he was discharged as ready and able to return to work. X-rays did not reveal any injuries to the bony structure or unusual condition other than mild hypertrophic arthritis in the lower back. Dr. Graves testified however that plaintiff could have *Page 778 
had a strain without any demonstrable external evidence, but that if the strain had been of the character alleged by plaintiff, he would have had a spasticity of the muscles, a condition which he did not find.
Dr. W.L. Bendel, a successful practitioner with more than thirty years experience, examined plaintiff in October. His examination included x-rays. He found no fracture or dislocation in plaintiff's back and felt that there was no cause for permanent or total disability. He discovered a chronic condition which he described as hypertrophic arthritis, which he considered not unusual for a man accustomed to hard work. His conclusion was that "from the length of time he (plaintiff) has been out, from the time I saw him, there is not reason why he should not be back to work." He believed plaintiff to be a malingerer.
Dr. W.L. Smith, a recognized expert in x-ray diagnosis and treatment, testified concerning x-rays made in May and July. He found no evidence of any fractures, dislocations or traumatic changes. He did observe the hypertrophic arthritis to, a degree not unusual in a laboring adult. He further noted that there was no evidence of increase in this condition during the time intervening between the first and subsequent x-rays. He qualified his opinion that he found no evidence of a condition that might be caused or aggravated by injury by stating that he found no such condition "insofar as one is warranted in forming their opinion from x-rays."
Dr. A. Scott Hamilton examined plaintiff on July 1, 1946, when he found plaintiff complaining of his back and leg (or legs). Dr. Hamilton found a definite muscular spasm extending from the middle of the dorsal region (which includes the lower spine or sacrum) and found that this spasm extended roughly ten inches on each side of the spine. This doctor put the plaintiff through various tests and testified that in his opinion the plaintiff was insincere and inaccurate in his statement as to what movements were painful. He examined the x-rays and found no bony condition other than mild hypertrophic arthritis of the lower spine which he considered indicated the existence of no total disability.
Dr. I.J. Wolffe examined plaintiff in November, 1946. He found a marked spasticity from the area of the twelfth dorsal vertebra on down to the sacrum. He found a definite inclination toward the left side. Plaintiff's temperature at the time was 99 degrees. He testified that he did not believe plaintiff could do common heavy labor without pain. His opinion was that the spasticity which he observed indicated a muscular injury to plaintiff's back. He did not believe that the condition he found was such that it might have been feigned.
Dr. Wolffe summed up his testimony with the statement: "There was a spasticity of the muscles from the lower dorsal down to the sacrum; upon movement of the leg and the sacroiliac joint there was likewise some spasticity. A definite observation of the patient in disrobing and then again putting on his clothes, and watching him when he left the office. He took the elevator down and walked out of the building without having seen me following, observing him, how carefully he was to get off the sidewalk down to the street and his movements plus my findings. I do not think that the individual was feigning."
Dr. E.D. Armstrong, whose experience included four and one-half years of industrial practice at the Louisiana Ordnance Plant, testified that he examined plaintiff in November; that he had a muscle strain in the back and arthritis in his spine. He noted a tenderness over the sacrospine and a spasticity of the muscles on the right side. He testified that the arthritis might have been aggravated by the accident.
Dr. C.H. Moseley examined the plaintiff and made x-rays. He found what he described as muscular rigidity and a listing to one side. He testified that plaintiff was awkward in bending over and handling himself and "got about like a man with his back hurting." He testified that the x-ray pictures showed a fracture through the fifth lumbar that was both definite and unmistakable and that the vertebra had been mashed down on the right side. He also found evidence of the arthritis but *Page 779 
testified that it was limited mostly to the area of the injury, that is between the fourth and fifth lumbar vertebra. He believed that the injury could aggravate the arthritic condition.
Dr. J.E. Walsworth, a practitioner for more than thirty years, made a complete physical examination and clinical study of plaintiff. He found that the plaintiff had a peculiar walk, indicating a dragging sensation of the left leg. He found what he described as an "exaggeration of the spinal muscles" and that plaintiff was hypersensitive over the lower left spine. He found no degenerative processes but believed there was a deep seated inflammatory reaction in the lower lumbar region. He found a definite spasticity of the muscles of the back on the left side and believed that plaintiff's manner of handling his left leg was a self imposed protective attitude that he has developed that gives him the greatest comfort. No person could simulate that unless they had experienced the pain that he has. It is a personal attitudinal protective attitude that he has." In his opinion, the injury might have involved protrusion of the intervertebral disc, the pulpy structure that cushions the joint between one vertebra and another. He noted that in many cases x-ray will not show a back injury and that an injury readily ascertainable from a picture taken at just the right angle might be entirely imperceptible on x-rays taken from other angles. He concluded from the history and physical findings and their collation to each other that 'there was bound to be an injury there, whether the x-ray showed it or not."
He concluded that plaintiff was completely and totally incapacitated for doing work as a common laborer.
The plaintiff was personally known to Dr. Walsworth, whose experience included fifteen years as Chief of the Orthopedic Service and four years as Chief of the General Surgical Staff at the St. Francis Sanitarium in Monroe, as well as service as Chief of General Surgical Staff at the Riverside Sanitarium at Monroe and at the Monroe Charity Hospital, with graduate work at the University of Vienna and several eastern American medical schools. He felt certain that there was a definite fracture of the fifth lumbar vertebra. He thought that surgery might be a benefit to plaintiff and that same would be "worth a trial by a competent man." When questioned he stated that he realized that there is often a difference in reactions and attitudes of a party whose case is currently at issue in Court, but, nevertheless, many of these had legitimate complaints.
[3, 4] The present situation is not unusual in a compensation case, particularly when the region involved is that of the lower spine where x-ray pictures are often inconclusive in their disclosures. This Court has held, McCray v. Yarbrough et al., La. App., 20 So.2d 447, that complete faith cannot be accorded to claims of an injured party as to the existence of pain simply upon his own testimony, and that when the case is dependent largely upon a condition of plaintiff not definitely ascertainable by examination, clinical or x-ray, the Court must give careful consideration to the surrounding circumstances, and the plaintiff can be more readily believed when those circumstances are corroborative of his alleged condition. In the case before us, the surrounding circumstances are consistent with plaintiff's claim that he suffered a serious back injury when the heavy piece of replacement machinery was carried down the stairway. All witnesses agree that the load weighed several hundred pounds. Its heavy weight is further indicated by the fact that the millwright, Mr. Stinnett, testified that he was given four men to assist him in bringing the heavy piece from its storage upstairs to the repair point. All witnesses agree that on account of the narrowness of the steel stairway, only one man could be used at each end of the carrying pipe, and due to the lack of space, the descent was made cater-cornered, with one of the heavily loaded carriers necessarily on a lower step than the other as they maneuvered their respective ends of the 1 1/4" pipe which was being used as a carrying stick. Once the difficult descent was accomplished, all four of the colored men assigned to the millwright for the carrying task were used to lift the weight from the floor to the *Page 780 
trucking buggy. This is corroborative of plaintiff's testimony of the unusual weight involved. Of the four workmen three, including plaintiff, testified at the trial. The fourth was in the Army and not available. Both of plaintiff's companions testified that plaintiff, as they were all engaged in loading the weight on the carrying buggy, stated that his back had been hurt in coming down the stairway. Plaintiff testified that he reported his hurting of his back to his foreman, a Mr. Jackson. It is noteworthy that the defendant did not call Mr. Jackson to the witness stand or make any explanation of his absence, and it is logical to conclude that he would have corroborated plaintiff on this point.
We are further strengthened in our conclusion that the plaintiff suffered a disabling injury by the testimony that plaintiff was a healthy thirty year old workman and had never before made a compensation claim. A former employer, Mr. J.S. Drew, one of the owners of a wholesale grocery company in Monroe, testified that plaintiff had worked for his company during 1944-1945 and that his work during that time was regular and satisfactory.
Ollie Brannon, another witness, testified that she had known Jessie "from a kid up;" that she had seen him once or twice a week since he got hurt; that he never was crippled before but after he was hurt "he come to walk crippled, walking with a stick one-sided."
Eula Johnson, plaintiff's mother, testified that Jessie Johnson lived with her; that prior to the injury complained of, he had worked regularly and that since the injury he has been unable to work; that he was "up and down" and she often had to rub his back and that while he was in good health prior to the accident, he has suffered continuously since. She testified that her son "don't sleep none at night." Her description of his condition is contained in the following answers:
"Well, he don't sleep none at night, it looks like the longer it has been running on the worse he gets, he had me up last night all through the night. He will first lay on his side and he has to lay drawed, he can't lay on his back at all."
"He can't get about at all without that stick, he can't go anywhere without that stick."
"No, sir; he keep the stick right by his bed, just reaches his hand out and gets it."
She testified that she makes a living for them by washing and ironing and seemed a bit proud of the fact that she had "six washings."
Smithie D. Miller testified that he had known plaintiff, Jessie Johnson, "ever since he was a boy;" that he went to see him when he was in bed after the injury and that after he commenced traveling on the street, he would walk one-sided; that Jessie traded at his store for about four months and that he had visited him at his house about once a week since the accident. His testimony was that Jessie was a normal individual in every way previous to the injury and that he had consistently appeared to be hurt or injured as he walked since the accident. He testified that plaintiff always worked and paid his bills before the accident, but that he was in arrears for the four months that he had traded with him since the accident. He testified that plaintiff's reputation for truth and veracity was good.
Other lay witnesses testified as to his disability, and, although plaintiff resided in a populous area and his daily movements were exposed to his neighbors and friends, and others who might be his neighbors without being his friends, no witness was introduced by defendant who had seen him do any act or perform any physical action in his home or on or off his premises inconsistent with his claimed disability.
We realize that there is a possibility that plaintiff in this case is a malingerer as believed by some of the doctors, in whose integrity the Court has utmost confidence. On the other hand, other doctors, including Dr. J.E. Walsworth, an outstanding physician, believed that plaintiff is disabled and needed treatment.
[5, 6] An examination of the testimony as a whole convinces us that plaintiff has met the burden which is upon the plaintiff in all cases, including compensation cases, of proving his claim by a preponderance of the evidence. *Page 781 
For the reasons assigned, the judgment appealed from is reversed and judgment is now rendered in favor of plaintiff, Jessie Johnson, and against defendant, The Brown Paper Mill Company, Inc., for compensation at the rate of Twenty and no/100 ($20) Dollars per week during the period of his disability, not to exceed four hundred weeks, payable in weekly installments beginning April 5, 1946, with 5% per annum interest on each installment from date until paid. The judgment is subject to credit for the first eight weeks already paid. Plaintiff's demands for medical expenses are dismissed as of non-suit. Costs to be borne by defendant.